IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICHAEL THAMES, SR.                    *
                                       *
          v.                           *          Civil No. JFM-04-2854
                                       *
M/V TARAGO, et al.                     *
                                    *****

MEMORANDUM

In this action Plaintiff Michael Thames seeks damages for injuries he suffered in an

accident onboard the marine vessel M/V Tarago while it was berthed at the Dundalk Marine

Terminal in Baltimore. Discovery has been completed, and Defendants Mid-Atlantic Terminal,

LLC and Wilhelmsen Lines, AS have filed motions for summary judgment. For the reasons

stated below, those motions are granted[1].

I.

In July 2002, Thames was employed as a driver for P&O Ports ("P&O"), a stevedoring

company operating in the Port of Baltimore. P&O hires, supervises, and trains its employees and

provides them with the equipment necessary to load and unload cargo from ships in port.

Although he possessed over thirty years of experience as a longshoreman, Thames had been

working as a driver for only a few months.

On the morning of July 25, P&O was unloading cargo from the M/V Tarago, a ship

owned by Defendant Wilhelmsen Lines, AS, at a terminal operated by Defendant Mid-Atlantic

Terminal, LLC ("MAT"). P&O assigned Thames to move cargo from Deck 3 up a ramp to the

main deck and then off the ship. To carry out this task, Thames was provided a "yard hustler" or

---

[1]My ruling on the summary judgment motions moots a motion to bifurcate filed by
Thames.

"fifth wheel", which is a tractor-like vehicle designed to pull trailers on and off ships and around the terminal area.  Before driving onto the M/V Tarago, Thames obtained an attachment for the yard hustler called a "peter," which is designed to allow the yard hustler to be hooked up to flat trailers called "mafis."  P&O owned and maintained the yard hustler and the peter.

At all times that morning, Thames was supervised by P&O employees, one of which was gang carrier Michael Brogley.  Sometime between 9 a.m. and 11 a.m., Brogley instructed Thames to attach his yard hustler to a mafi located close to the ramp on Deck 3 and move it up the ramp to the main deck.  According to Thames, the mafi had several smaller boxes on its front end and a much larger box on the back end.  According to Brogley, at least some of the boxes had writing on them indicating their weights.  Upon seeing the mafi, Thames thought the boxes looked too heavy for the yard hustler to safely move the mafi and told a P&O supervisor so.  The supervisor, whom Thames cannot now identify but most likely was Brogley, disregarded Thames' warning and told him to proceed.

Thames attached the peter on his yard hustler to the mafi and Brogley attached large safety chains from the yard hustler to the mafi.  Thames then began to drive the yard hustler up the ramp.  After proceeding a short distance, the mafi detached from the peter and fell backward, causing the yard hustler to rise into the air under the weight of the mafi.  The yard hustler, which was still attached by chains to the mafi, began to violently bounce up and down.  Thames repeatedly hit his head on the ceiling and steering wheel, resulting in serious injuries.

It is undisputed that no MAT employees were onboard the ship at the time of the accident.  Brogley testified that he was not aware of anyone from the ship's crew having been on Deck 3 at the time of the accident, but Thames testified there were multiple "WW" employees in

the area at the time.  Presumably these "WW" employees were the ship's crew.

Following the accident, Thames brought suit against the M/V Tarago and "MID ATLANTIC TERMINAL, a body corporate a Subsidiary [sic] or division of, or T/A WALLENIUS WILHELMSMEN LINES TERMINALS also known as WALLENIUS WILHELMSEN ATLANTIC LLC, a body corporate."  (Am. Compl. at 1.)  The suit was originally filed in the Circuit Court of Baltimore City and removed on diversity grounds. Thames' complaint contains two counts, one under the Longshore and Harbor Workers Compensation Act ("LHWCA"), 33 U.S.C. § 905(b), and one for common law negligence.

## II.

Summary judgment is proper where there is no genuine issue of material fact and the moving party proves that it is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56. When assessing a motion for summary judgment, the court must draw all justifiable inferences in favor of the non-moving party.  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  Although the party moving for summary judgment initially bears the burden of showing there is no genuine issue of fact, the non-moving party cannot rest on the allegations of his pleadings but rather must show -- through affidavits, depositions, answers to interrogatories, or admissions on file -- specific facts showing there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita,* 475 U.S. at 587.

## III.

Terminal operators like MAT cannot be sued under § 905(b) of the LHWCA, which by

its explicit terms permits third-party suits for injuries "caused by the negligence of a *vessel*." 33

U.S.C. § 905(b) (emphasis added).  Nor can Thames succeed under a common law negligence

theory, because he has failed to show a duty between MAT and himself.[2]  *See Solano v. Beilby*,

761 F.2d 1369, 1373 (9th Cir. 1985) ("There is no precedent for imposing a duty of care on the

terminal operator toward third parties, such as longshoremen.  Stevedores are generally

responsible for protecting their employees, the longshoremen, from potential danger.")

Likewise, Thames has failed to show any act or omission by MAT that proximately caused the

injury.  No MAT employees were onboard the ship at the time of the accident and MAT did not

provide any of the equipment used by Thames.[3]

IV.

Under LHWCA § 905(b), a shipowner is liable for an injury to a longshoreman only

when the injury is caused by the ship's negligence.  *Bonds v. Mortensen & Lange*, 717 F.2d 123,

---

[2]This assumes Thames can even proceed under a theory of common law negligence.  It appears Thames' claim meets the test for admiralty jurisdiction and is therefore governed by the general maritime law.  *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (describing the "location test" and the "connection test" for determining admiralty jurisdiction).  The claim arises from an incident on a ship in navigable waters and bears a substantial relationship to a traditional maritime activity.

[3]Thames alleges that a single entity, which he calls at various times "Wilhelmsen & Wilhelmsen," "Wallenius Wilhelmsen," and "Wilhelmsen & Wilhelmsen Lines," controlled both the terminal and the ship and I should not release MAT from liability until I determine the liability of this entity.  Thames has failed to show how this "multinational conglomerate" is directly responsible for this accident, however, and he explicitly states he does not ask me to pierce the corporate veil.  (See Pl.'s Resp. to MAT's Mot. for Summ. J. at 3.)  Moreover, Thames does not name this conglomerate as a defendant in his amended complaint.  He names "Wallenius Wilhelmsen Lines Terminals," which, insofar as the record reflects, does not exist, and "Wallenius Wilhelmsen Atlantic LLC", which exists but is neither the parent company of MAT nor the owner of the M/V Tarago.  MAT is wholly owned by Wallenius Wilhelmsen Lines Americas Holdings LLC and the ship is owned by Wilhelmsen Lines, AS.

4

126 (4th Cir. 1983).  The United States Supreme Court clarified the negligence standard in

*Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156 (1981).  The Court made

clear that the primary responsibility for the safety of longshoremen lies with the stevedore and

not the shipowner.  *Id.* at 180 (Powell, J., concurring).  The shipowner has a justifiable

expectation that the stevedore will "perform with reasonable competence and see to the safety of

the cargo operations."  *Id.* at 172.

> Shipowners owe three general duties to longshoremen:
>
> The first [duty], which courts have come to call the "turnover duty," relates to the
> condition of the ship upon the commencement of stevedoring operations.  The
> second duty, applicable once stevedoring operations have begun, provides that a
> shipowner must exercise reasonable care to prevent injuries to longshoremen in
> areas that remain under the "active control of the vessel."  The third duty, called
> the "duty to intervene," concerns the vessel's obligations with regard to cargo
> operations in areas under the principal control of the independent stevedore.

*Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98 (1994) (citations omitted).  Under the

"turnover duty", the shipowner must turn the ship over to the stevedore in such condition that

"an expert and experienced stevedore will be able by the exercise of reasonable care to carry on

its cargo operations with reasonable safety to persons and property."  *Scindia*, 451 U.S. at 167.

A corollary to the turnover duty requires the shipowner to warn the stevedore of any latent

hazards on the ship that are not open and obvious but are known to the shipowner or should be

known to it in the exercise of reasonable care.  *Howlett*, 512 U.S. at 99.  The turnover duty to

warn of latent defects in the cargo stow and cargo area is a "narrow one" because a ship's crew

"does not exercise the same degree of operational control over, and does not have the same

access to" those areas.  *Id.* at 105; *see also Clay v. Daiichi Shipping*, 74 F. Supp. 2d 665, (E.D.

La. 1999) (storage of loose steel pipes in cargo area was an open and obvious hazard such that

shipowner did not violate duty to warn).

Thames' principal claim against Wilhelmsen Lines, AS  appears to be that it violated the turnover duty by failing to warn P&O Ports about the arrangement and weight of the items on the mafi.  This argument fails because the evidence on the summary judgment record clearly establishes that the arrangement and weight of the items on the mafi were open and obvious to P&O.  The items on the mafi were in plain view; Thames testified that he saw several small boxes on the front end and a large box on the back end.  Moreover, Brogley's testimony indicates Wilhelmsen Lines, AS provided paperwork to P&O detailing the weight of cargo to be unloaded.  (Brogley Dep., Wilhelmsen Lines, AS's Mot. for Summ. J., Ex. 3 at 22-23.)  Thames has not alleged that ship personnel misinformed P&O of the weight upon the mafi, nor is there any evidence of this.  Further, Brogley testified that "there were weights written [on some of the items on the mafi], but I didn't really pay attention to any of them."  (*Id.* at 33.)  Finally, Thames himself warned his supervisor just prior to the accident that the items looked too heavy.  This explicit verbal warning put P&O on further notice of the potential hazard.[4]

The second duty of a shipowner, to exercise reasonable care to prevent injuries to longshoremen in areas that remain under the active control of the vessel, does not apply here.  Although there is some dispute whether employees of Wilhelmsen Lines, AS were on the deck at the time of the accident, the cargo operations were indisputably under the active control of the stevedore.

The third duty requires a shipowner "to intervene and stop unloading operations when the

---

[4]Thames also contends that the ramp between Deck 3 and the main deck was too narrow to allow P&O to use additional machinery to assist Thames in moving the mafi.  To the extent the width of the ramp was a hazard, however, it also was open and obvious.

stevedore's judgment in carrying out his tasks is 'obviously improvident.'" *Bonds*, 717 F.2d at

126-27 (quoting *Scindia*, 451 U.S. at 175).   While Thames claims ship personnel were in the area

at the time of the accident, there is no evidence to suggest they knew or should have known

Thames' yard hustler was not powerful enough to haul the mafi.   The expertise required to

determine which equipment is needed to unload cargo lies with the stevedore, not ship personnel.

As the stevedore, P&O had the responsibility to either provide its employees the appropriate

equipment to safely remove cargo or, if it did not have the equipment, to refuse the job.   A

shipowner cannot be held responsible if, unbeknownst to the shipowner, the stevedore

knowingly uses inappropriate equipment.   *See Scindia*, 451 U.S. at 172 ("The shipowner, within

limits, *is* entitled to rely on the stevedore, and owes no duty to the longshoremen to inspect or

supervise the cargo operations.").   Here, plaintiff has presented no evidence showing that

Wilhelmsen Lines, AS was not entitled to rely on P&O's expertise.[5]

   In sum, when the evidence on the summary judgment record is viewed in the light most

favorable to Thames, it points to the liability of the stevedore and not the shipowner nor the

terminal operator.   P&O supplied all of Thames' equipment and directed Thames to move the

---

[5]Thames' common law negligence claim against Wilhelmsen Lines, AS also fails for the straightforward reason that § 905(b) of the LHWCA is the sole basis under which vessels can be sued by longshoremen.   *See* 33 U.S.C. § 905(b) ("The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.").   Again, just as he does in connection with his claims against MAT, *see* note 2, *supra*, Thames suggests he should be allowed to proceed under a negligence theory because global conglomerate "Wallenius Wilhelmsen" is the true owner of the M/V Tarago.   Once again, however, Thames fails to show how this conglomerate is responsible for the accident in question and does not allege facts sufficient to pierce the corporate veil.   Moreover, the owner of the ship is in fact Wilhelmsen Lines, AS, not "Wallenius Wilhelmsen."

mafi despite his verbal warning.  Under § 905(b) of the LHWCA, "If [the injured] person was

employed by the vessel to provide stevedoring services, no such action shall be permitted if the

injury was caused by the negligence of persons engaged in providing stevedoring services to the

vessel."  33 U.S.C. § 905(b).  Accordingly, MAT and Wilhelmsen Lines, AS are entitled to the

summary judgment they seek.  A separate order granting their motions is being entered herewith.


<u>January 31, 2006</u>                                        /s/_____
Date                                                        J. Frederick Motz
                                                            United States District Judge